IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALAN C., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   No. 20 C 7757 |
| | ) |
| KILOLO KIJAKAZI, Acting | )   Magistrate Judge Finnegan |
| Commissioner of Social Security,[1] | ) |
| | ) |
|     Defendant. | ) |

## ORDER

Plaintiff Alan C. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the ALJ's decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff protectively filed an application for SSI on February 14, 2018, alleging that he has been disabled since July 18, 2017 due to a missing left arm, active stress disorder, and a mild neurocognitive disorder. (R. 169, 193). Born in 1967, Plaintiff was 51 years old as of the application date, making him a person closely approaching advanced age

---

[1]     Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

(age 50-54). (R. 169); 20 C.F.R. § 416.963(d). Plaintiff has a 10th grade education and resides in a supportive living facility. (R. 33-35, 194). His work history includes sporadic employment doing temp jobs as a warehouse helper and stock clerk. (R. 36-37, 194). In June 2017, Plaintiff took a job as a metal cutter but he stopped working the following month after he injured his left hand and wrist in a cutting machine, resulting in the amputation of his left arm below the elbow. (R. 193-94, 525, 539). He has not engaged in any substantial gainful activity since the July 17, 2017 alleged disability onset date.

The Social Security Administration denied Plaintiff's application initially on June 20, 2018, and again upon reconsideration on December 7, 2018. (R. 69-93). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Kevin Vodak (the "ALJ") on January 17, 2020. (R. 29). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Thomas Allen Gusloff (the "VE"). (R. 31-68). On March 3, 2020, the ALJ found that Plaintiff's status post left-arm amputation and obesity are severe impairments, but that they do not alone or in combination with his non-severe impairments meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15-18). After reviewing the evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work involving: occasional reaching overhead with the left upper extremity; frequent reaching in other directions with the left upper extremity; occasional pushing and pulling with the left upper extremity; occasional handling with the left hand using a hook; no using the left hand to finger or feel; occasional climbing of ladders, ropes, or scaffolds; occasional crawling; frequent kneeling, stooping, and crouching; and no exposure to extreme heat or humidity. (R. 18-23).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could not perform Plaintiff's past relevant work as a warehouse laborer and cut-off saw tender, but could perform a significant number of other jobs available in the national economy, such as school bus monitor, usher, and investigator. (R. 23-24). As a result, the ALJ concluded that Plaintiff was not disabled at any time from the February 14, 2018 application date through the date of the decision. (R. 24). The Appeals Council denied Plaintiff's request for review on October 28, 2020. (R. 1-5). That decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. §§ 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of his request for reversal or remand, Plaintiff argues that the ALJ (1) failed to properly evaluate his subjective statements regarding his symptoms in assessing his physical RFC; (2) erred in omitting mental limitations from the RFC; and (3) relied on flawed VE testimony in finding him capable of performing a significant number of jobs. For reasons discussed in this opinion, the Court finds that the ALJ did not commit reversible error and his decision is supported by substantial evidence.

## DISCUSSION

**A.** **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making

3

credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.  Five-Step Inquiry**

To recover SSI, a claimant must establish that he is disabled within the meaning of the Social Security Act. *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

4

for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves considering whether: "(1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). *See also Melvin J. v. Kijakazi*, No. 20 C 3284, 2022 WL 2952819, at *2 (N.D. Ill. July 26, 2022) (citing 20 C.F.R. § 416.920(a)). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Butler*, 4 F.4th at 501.

**C.     Analysis**

    **1.     Subjective Symptoms and Physical RFC**

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in finding that his statements regarding the intensity, persistence, and limiting effects of his symptoms were not fully supported. In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors including: the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL

5

5180304, at *5, 7-8 (Oct. 25, 2017). "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022)). "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts*, 27 F.4th at 1278.

Plaintiff testified that his left arm is "totally useless," though if he is carrying something he can use the prosthesis to help support it. (R. 43). He is right-handed and has no problems using his right arm and hand. (R. 34, 44, 220). Plaintiff estimated that he can lift 20 pounds or less and said he has no trouble standing for long periods, but he has a hard time bending down to get things. (R. 44-45). At the assisted living facility, Plaintiff helped other residents each day by pushing them in a wheelchair. He also cleaned doorknobs and elevator buttons, and made silverware packets by putting utensils in a napkin and rolling it up. (R. 46, 47, 49, 216). Plaintiff sometimes has trouble wearing his prosthesis in the summer because it gets sweaty, itchy, and irritated. (R. 51-52). He is also limited in his ability to move his left elbow and reach with the left arm. (R. 52-53).

In a May 18, 2018 Function Report, Plaintiff stated that he has some trouble dressing himself but is otherwise able to complete personal care activities. (R. 216). Though his balance "is off," he prepares ramen noodles in the microwave, folds clothes,

6

goes out daily, can use public transportation, shops in stores every couple of weeks, plays computer games, goes to appointments, and attends nursing center activities. (R. 216-19). Plaintiff indicated that he can only lift 10 pounds and cannot reach with his left arm due to stiffness/soreness in the shoulder. (R. 220).

In discounting Plaintiff's claims of disabling limitations, the ALJ first determined that his statements were inconsistent with the objective medical evidence. (R. 21). The Court finds no error in this assessment. Plaintiff injured his left hand and wrist on July 19, 2017 when his hand got stuck in a cutting machine at work. (R. 20, 333). He had surgery to repair the damage but by August 2017 the forearm had become gangrenous and needed to be amputated below the elbow. (R. 20, 525, 539). Following an "uncomplicated" post-operative hospital stay, Plaintiff was discharged in good condition to the Niles Nursing and Rehabilitation Center (the "Niles Center"), where he lived to avoid homelessness. (R. 20, 525, 526). While at the Niles Center, Plaintiff engaged in physical therapy ("PT") and occupational therapy ("OT"), and generally had few complaints about his left arm.

On October 17, 2017, two months post-amputation, Plaintiff had increased his range of motion in the left shoulder and elbow, and the phantom limb pain had decreased by half. (R. 21, 871). Though Plaintiff still needed 24 hour care at that time (R. 873), OT notes reflect that he was doing his own laundry in December 2017 (R. 21, 901), and by February 2, 2018, he was fully independent in his self-care routine, including, eating, oral hygiene, toilet hygiene, dressing, washing, showering/bathing, and putting on and removing footwear. (R. 21, 858). In March 2018, Plaintiff was able to don and doff his prosthesis, which had a hook, and started shaving in front of a mirror with supervision. (R. 21, 875). As of April 2, 2018, Plaintiff had improved muscle strength, mobility, and

endurance and was able to perform transfer movements and self care with the left arm prosthesis. (R. 21, 626).

Plaintiff was evaluated dozens of times between May 2018 and August 2019. He occasionally complained of phantom limb pain, skin rash, and itching, but the symptoms were entirely controlled with Tylenol and Plaintiff did not want additional medication. (R. 20-21, 22, 1366, 1370, 1485, 1585, 1587, 1589, 1593, 1595, 1597-98, 1601, 1603, 1605, 1608, 1610, 1611, 1613, 1620). In addition, more often than not, Plaintiff reported no pain at all and he routinely presented with a well-healed stump, no rash, intact sensation, symmetrical reflexes, spontaneous motor movement in all four limbs, no edema, and normal gait. He also remained independent in mobility and self-care. (R. 21-22, 603, 606, 612, 1330, 1333-35, 1340, 1342, 1343-45, 1347-49, 1351, 1353-54, 1356, 1357, 1359-60, 1361, 1363, 1365, 1367, 1369, 1372, 1374, 1375, 1377, 1380-82, 1384, 1385, 1389, 1393, 1394, 1396, 1398, 1399, 1401, 1403, 1405, 1415-20, 1423-24, 1427-28, 1429-30, 1431, 1433-34, 1435-36, 1438, 1439-40, 1442, 1460, 1463, 1465-66, 1471, 1476, 1583-98, 1603-05, 1607-09, 1612-13, 1614-15, 1620, 1623-24, 1631, 1634, 1638, 1653, 1672-73). When Plaintiff transferred to Eden Supportive Living on August 19, 2019, the facility determined that he was not a fall risk and could perform all of his activities of daily living, though he requested a service for laundry and housekeeping. (R. 1672-73).

Plaintiff fails to explain how these findings evidence disabling symptoms. *See Thorps v. Astrue*, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012) (citing *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)) ("[A] patient's subjective complaints are not required to be accepted insofar as they clashed with other, objective medical evidence in the record."). It is true that Plaintiff sometimes walked with decreased foot clearance and

cadence for long distance, and exhibited decreased range of motion and muscle strength in both arms. (Doc. 17, at 6; Doc. 26, at 3). But the ALJ acknowledged this evidence and specifically accounted for these deficiencies by limiting Plaintiff to light work with only: occasional reaching overhead; occasional pushing and pulling with the left upper extremity; occasional handling with the left hand using a hook; no fingering or feeling with the left hand; occasional climbing of ladders, ropes, or scaffolds; occasional crawling; and frequent kneeling, stooping, and crouching. (R. 18, 22).

Notably, Plaintiff does not articulate what additional physical restrictions belong in the RFC based on his testimony or otherwise. A claimant's RFC is the maximum work that he can perform despite any limitations. 20 C.F.R. § 416.945(a)(1); SSR 96-8p. "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). *See also* 20 C.F.R. § 416.927(f)(2). The only physicians of record who opined as to Plaintiff's physical functioning are the state agency consultants. On June 18, 2018, James Madison, M.D., indicated that Plaintiff can occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit, stand, and walk for about 6 hours in an 8-hour workday; occasionally push and pull with the left hand; occasionally handle with the left hand; and never finger with the left hand. (R. 75-76). Charles Kenney, M.D., affirmed this assessment on November 30, 2018. (R. 88-90).

The ALJ found these opinions partially persuasive and determined that Plaintiff has an even more restrictive RFC as stated above. (R. 22). Plaintiff does not identify any doctor who found him more limited, and "courts within this Circuit have repeatedly

9

held that '[t]here is no error' in the formulation of an RFC 'when there is no doctor's opinion contained in the record [that] indicates greater limitations than those found by the ALJ.'" *Hosea M. v. Saul*, No. 18 C 2926, 2019 WL 5682835, at *7 (N.D. Ill. Nov. 1, 2019) (quoting *Best v. Berryhill,* 730 F. App'x 380, 382 (7th Cir. 2018)). Plaintiff states in conclusory fashion that "it does not appear that" Drs. Madison and Kenney reviewed records showing diminished range of motion and strength in the upper extremities. (Doc. 17, at 6). This speculative argument lacks merit given that records reflecting such limitations were available to both physicians when they issued their opinions. (R. 627 (April 2, 2018), 747 (October 2, 2017), 774 (September 11, 2017), 1338 (November 12, 2018), 1370 (August 13, 2018)). *See Stewart v. Berryhill*, 731 F. App'x 509, 510 (7th Cir. 2018) ("Unsubstantiated claims are of course, no substitute for evidence.") (internal quotations omitted).

Contrary to Plaintiff's suggestion, the ALJ did not improperly discount his subjective statements based solely on the conflicting medical evidence. (Doc. 17, at 4). The ALJ also noted, for example, that Plaintiff received only conservative treatment following the amputation, consisting of PT and OT to improve functioning, muscle strength, mobility, and endurance. (R. 21). "As a general matter, an ALJ is entitled to consider the routine and conservative nature of a claimant's treatment in assessing the claimant's credibility." *Edward H. v. Kijakazi*, No. 20 C 3847, 2023 WL 2683171, at *10 (N.D. Ill. Mar. 29, 2023) (citing *Simila*, 573 F.3d at 519). Plaintiff denies that his treatment was in fact conservative (Doc. 17, at 5; Doc. 26, at 1-2), but the Seventh Circuit recently made clear that physical therapy (and presumably also occupational therapy) constitute "conservative" treatments. *Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022).

Finally, the ALJ determined that Plaintiff's daily activities did not support his claims of disabling limitations. (R. 22). "[I]t is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated." *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). Here, the ALJ concluded that Plaintiff's ability to push people in a wheelchair, clean doorknobs and elevator buttons, roll silverware in a napkin, do laundry, and go shopping once a week was one factor weighing against the reliability of Plaintiff's statements. (R. 22). The Court finds no error in this assessment. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules.").

Viewing the record as a whole, the ALJ provided several valid reasons for rejecting Plaintiff's complaints of disabling limitations, and that decision was not patently wrong. *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)) ("The ALJ's credibility assessment need not be perfect; it just can't be patently wrong."). The ALJ likewise did not commit reversible error in finding Plaintiff more physically limited than any physician of record. Since that conclusion is supported by substantial evidence, Plaintiff's request to remand the case for further consideration is denied. *Biestek*, 139 S. Ct. at 1154 ("Substantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

### 2. Mental Limitations

Plaintiff argues the case still requires reversal or remand because the ALJ erred in failing to include mental limitations in the RFC. The Court disagrees. The record reflects that following the amputation, Plaintiff underwent a short course of speech, language, and cognitive therapy in August 2017. Within a couple of weeks his judgment, deductive reasoning, and problem solving skills had significantly improved, though he still required some minimal to mild cueing with his reasoning skills and short-term recall. (R. 17, 980, 985). During a Neuropsychological Evaluation with Robert E. Puls, Psy.D., on September 16, 2017, Plaintiff had mild memory and problem-solving deficits and showed signs of clinical depression. (R. 17, 578). His test scores revealed low to low average intelligence, and his verbal skills were slightly underdeveloped, likely due to the fact that English is his second language. (R. 16, 577). Dr. Puls assessed acute stress disorder and mild neurocognitive disorder, and recommended that Plaintiff be evaluated for antidepressants. (*Id.*). There is no evidence that Plaintiff was ever prescribed psychotropic medications, but he did take Ambien as needed for insomnia. (R. 17, 1007-16, 1018-21, 1027, 1029-31, 1330, 1332, 1351).

By January 2018, Plaintiff was routinely denying symptoms of depression and anxiety, and at medical exams he regularly presented as cooperative with a normal mood and affect. (R. 17, 643, 650, 662, 658-59). Though Plaintiff had poor attention and appeared restless during one appointment on April 2, 2018 (R. 626), his mood and affect returned to normal two days later on April 4, 2018, and remained that way through August 29, 2018. (R. 17, 603-04, 611-12, 625, 1352, 1356, 1363, 1383, 1389, 1394, 1399, 1405). Between September 18, 2018, and February 26, 2019, Plaintiff saw Dr. Puls eight times

12

for psychotherapy. Dr. Puls indicated that at those sessions, Plaintiff was variously anxious, depressed, irritable, and guarded, with occasional confusion and tangential thought process. (R. 1451-59). Yet Dr. Puls did not recommend any medication or impose specific restrictions on Plaintiff's mental functioning. And though Plaintiff had a verbal argument with another resident in November 2018 (R. 1337), from March 13 through July 19, 2019, his mental status exams were once again entirely normal. (R. 17, 1419, 1421, 1583, 1586, 1588, 1590, 1592, 1594, 1596, 1598, 1600, 1603-05, 1607, 1610-12, 1614, 1620, 1623).

Plaintiff fails to explain how these records demonstrate greater limitations than those set forth in the RFC. Notably, the ALJ once again relied on uncontradicted opinions from the state agency consultants in assessing Plaintiff's mental functioning. On June 13, 2018, Keith Burton, Ph.D., found that Plaintiff has: a mild limitation in understanding, remembering, or applying information; a mild limitation in concentration, persistence, or pace; and a mild limitation in adapting and managing himself. (R. 73). Dr. Burton acknowledged that Plaintiff has been diagnosed with a mild neurocognitive disorder and has exhibited some symptoms of depression, but opined that his mental impairment is non-severe and does not impose any related restrictions. (R. 74). Lionel Hudspeth, Psy.D., affirmed this assessment on November 29, 2018. (R. 86-87). The ALJ found both opinions persuasive and accepted the doctors' conclusions. (R. 17).

Plaintiff does not identify any physician of record who found him more limited than the ALJ or imposed any restrictions on his psychological functioning. *Best*, 730 F. App'x at 382. Instead, Plaintiff argues that the opinions from Drs. Burton and Hudspeth were outdated and so unreliable. (Doc. 17, at 11-12). "It is common for there to be a lag

13

between the state agency physicians' reviews and the ALJ's decision, so the fact that new medical records came in after the state agency physicians conducted their reviews, is not, by itself, problematic." *Shelia M. v. Saul*, No. 20 C 664, 2021 WL 1784775, at *6 (N.D. Ill. May 5, 2021) (citing *Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017)). "Rather, an outdated state agency problem occurs if there exists 'later evidence containing new, significant medical diagnoses [that] reasonably could have changed the reviewing physician's opinion.'" *Id.* (quoting *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018)).

Plaintiff argues that the opinions from Drs. Burton and Hudspeth are outdated because they did not have access to psychotherapy records from Dr. Puls. (Doc. 17, at 11). This is not accurate. Both physicians were able to review Dr. Puls' September 16, 2017 Neuropsychological Evaluation. (R. 578). In addition, Dr. Hudspeth had access to Dr. Puls' treatment notes from September 18, November 6, and November 13, 2018. (R. 1457-59). Plaintiff does not identify any new diagnoses from Dr. Puls (or any other physician), much less ones that could have changed the reviewing physicians' opinions. It is true that Drs. Burton and Hudspeth offered their assessments before Plaintiff transferred to Eden Supportive Living in August 2019, and one of those intake records indicated that Plaintiff needs assistance taking his medications. (Doc. 17, at 10, 11) (citing R. 1671). But contrary to Plaintiff's suggestion, this is not a new mental diagnosis that renders the state agency opinions outdated.

Nor is this a case where Plaintiff has been assessed with a severe mental impairment, is taking strong medications to control fluctuations in his symptoms, or has resisted treatment due to his mental illness. As noted, no physician has prescribed

14

medications for Plaintiff's psychological symptoms, and exams routinely show him to be cooperative with a normal mood and affect. In such circumstances, Plaintiff's citation to cases involving individuals who need heavy medications to address their major depression and bipolar disorder does nothing to advance his argument. *Compare O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016) (addressing claimant diagnosed with "major depression, recurrent severe"); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("More importantly, symptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression."); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days."); *Rosario v. Saul*, No. 18 C 1878, 2019 WL 3997139, at *5 (E.D. Wis. Aug. 22, 2019) (addressing a claimant diagnosed with bipolar disorder); *Sabey v. Colvin*, No. 14 C 3301, 2015 WL 9182518, at *7 (N.D. Ill. Dec. 17, 2015) (same).

Viewing the record as a whole, the ALJ did not commit reversible error in adopting the uncontroverted opinions from the state agency consultants and finding that Plaintiff has no work-related mental limitations. Plaintiff's request to remand the case for further consideration of this issue is denied.

### 3. VE Testimony

Plaintiff finally argues that the case requires remand because the ALJ relied on flawed VE testimony in finding him capable of performing a significant number of jobs available in the national economy. The VE testified that a person with Plaintiff's background and RFC is capable of working as a school bus monitor (25,000 jobs nationally), an usher (25,000 jobs nationally), and an investigator (50,000 jobs nationally).

15

(R. 63-64). According to the VE, all of these jobs are light and unskilled with a reasoning level of 2. (R. 64). Plaintiff claims that there is an obvious conflict between this testimony and the Dictionary of Occupational Titles ("DOT"). Specifically, he says the investigator job requires a reasoning level of 4, which is beyond his capabilities, and the school bus monitor job requires that he prevent altercations between students and damage to the bus, which he cannot do with a prosthesis. (Doc. 17, at 7-9; Doc. 26, at 6-7).

If "evidence from a VE 'appears to conflict with the DOT,' SSR 00-4p requires further inquiry: an ALJ must obtain 'a reasonable explanation for the apparent conflict.'" *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (quoting SSR 00-4p). A conflict is apparent if it is "so obvious that the ALJ should have picked up on [it] without any assistance." *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011) (quoting *Overman*, 546 F.3d at 463). The ALJ must resolve any apparent conflicts even if the claimant's counsel did not raise the issue at the administrative level. *Overman*, 546 F.3d at 463. *See also Brown v. Colvin*, 845 F.3d 246, 254-55 (7th Cir. 2016) (where an apparent conflict exists, "a claimant's failure to object during a hearing cannot excuse an ALJ's failure to" obtain a reasonable explanation for the conflict).

The Court is not convinced that either of the conflicts Plaintiff identifies was sufficiently apparent that the ALJ should have picked up on them without assistance. With respect to the investigator job, the DOT clearly states that it requires a reasoning level of 2, as the VE testified. *See* https://occupationalinfo.org/24/241367038.html; (R. 64). Plaintiff now claims that the SkillTRAN database indicates the position carries a reasoning level of 4, and that under the Occupational Outlook Handbook, the job should be classified as an information clerk and typically requires a high school degree. (Doc. 17, at 8; Doc.

16

26, at 6). But despite being represented by counsel at the hearing, Plaintiff did not raise these issues or argue that the investigator position was beyond his capabilities. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) ("[B]ecause Summers was represented by counsel at the hearing, she is presumed to have made her best case before the ALJ."). Similarly, the VE testified that Plaintiff can work as a school bus monitor regardless of his prosthesis and Plaintiff's counsel did not raise any related objections or concerns. In such circumstances, the ALJ reasonably relied on the VE's testimony as to the representative jobs Plaintiff can perform. *See Tina S. v. Kijakazi*, No. 21 C 50167, 2022 WL 3700837, at *4 (N.D. Ill. Aug. 26, 2022) ("Because plaintiff failed to raise any conflict at the administrative hearing and failed to argue any obvious conflict on appeal, the ALJ was entitled to rely on the VE's uncontradicted testimony.").

Since all 100,000 representative jobs the VE identified are properly available to Plaintiff, there is no merit to Plaintiff's objection that the total number of jobs is too small to be significant, resulting in an error at step 5 of the analysis. (Doc. 17, at 9-10; Doc. 26, at 6). *See Reva T. v. Kijakazi*, No. 21 C 5475, 2023 WL 2711640, at *6 (N.D. Ill. Mar. 30, 2023) ("[A] reasonable person would accept as significant 100,000 total jobs existing in the national economy."). The Court notes that even if only the usher position remained, there is authority indicating that 25,000 jobs nationally is still significant. *See Akindayo O. I. v. Kijakazi*, No. 20 C 7777, 2022 WL 3543539, at *3 (N.D. Ill. Aug. 18, 2022) (collecting cases) ("Given that four federal appellate courts have found less than 30,000 jobs nationally to be significant, the Court believes the Seventh Circuit would do so as well.").

## **CONCLUSION**

For reasons stated above, Plaintiff's request to reverse or remand the case is denied and the Commissioner's Motion for Summary Judgment [24] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: April 12, 2023

_____
SHEILA FINNEGAN
United States Magistrate Judge